902 P.2d 824

**The STATE of Arizona, Appellee,**

v.

**Gerardo Brito ORANTEZ, Appellant.**

**No. CR–95–0060–PR.**

Supreme Court of Arizona,
En Banc.

Sept. 26, 1995.

Grant Woods, Attorney General By Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Joseph T. Maziarz, Assistant Attorney General, Phoenix, for Appellee.

Isabel G. Garcia de Romo, Pima County Legal Defender By Kathleen C. Dubois, Deputy County Public Defender, Tucson, for Appellant.

## OPINION

MOELLER, Vice Chief Justice.

Gerardo Orantez was convicted of kidnapping and sexual assault, and sentenced to nine years in prison. The court of appeals affirmed. We granted review and now reverse because the trial court should have ordered a new trial based on newly discovered evidence. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) §§ 13–4031 (1989) and 13–4033 (Supp.1994), and Arizona Constitution article VI, 5(3).[1]

## FACTS

The victim, Monica, and her friend, Rachel, met at Sunny's Bar in Tucson on the evening of April 8, 1992. According to Rachel, a man, later identified by both women as the defendant, approached them and introduced himself as "Danny Orantez." Monica identified her assailant as a bouncer at Sunny's whose last name was Orantez. According to the bartender, however, defendant was never a bouncer at Sunny's.

Rachel testified that defendant was wearing gray pants and a white shirt. Defendant invited the two over to his place for a lasagna dinner and wrote an address and directions on a napkin. The bartender confirmed that defendant spoke with Monica at Sunny's on the night of the alleged crime.

Rachel left Sunny's at about 11:00 p.m. Monica stayed until after midnight. Shortly after 1:00 a.m., Monica was heard shouting in a Tucson neighborhood that she needed help because she was being raped. Area residents found her on the ground near her car, and she pointed in the direction of the desert. Two residents briefly followed a man in blue jeans and a gray T-shirt, but failed to apprehend him. Monica had some abrasions, but no lacerations or other serious injuries.

A police officer arrived and found Monica hysterical. The two residents described the suspect as a "skinny" Hispanic male, about five foot five. Monica also identified her assailant as slender and five foot four or five foot five in height. Defendant is five foot nine and, defense counsel argued at trial, not "skinny." She told the officer that a girlfriend had taken her home from Sunny's, her doorbell rang, and she answered the door, expecting her boyfriend. Instead, the man she had met at Sunny's was at her door with a knife. Two months later, in June, Monica gave another statement to a different police officer in which she reiterated that she had been abducted at her home.

At trial, Monica changed her story substantially. Instead of being abducted at her home, she now testified that defendant approached her car in the parking lot at Sunny's and asked her for a ride home. When she refused, he pulled a knife on her and forced her to drive to the desert where he sexually assaulted her. She claimed her original statement to the police officer and her later statement to the detective, to the

---

1. The state originally challenged the court of appeals' jurisdiction over part of the appeal. As a result, defendant sought and obtained permission to supplement the record in that court. That court proceeded to the merits, apparently concluding that it had jurisdiction, although the issue is not discussed in its memorandum decision. The court's jurisdiction is unchallenged here.

effect that she had been abducted at home, were lies that she had concocted because she was concerned she would get in trouble for driving with expired tags on her car. Regardless of the place of abduction, Monica testified that she was forced into the car through the passenger door, sliding across the front seat to the driver's side of her car. However, an undamaged yellow rose was found tucked neatly in the front seat across which she said she slid. She stated that during the assault she bit the assailant's penis and then ran away.

Police did not find a knife, but they did find a screwdriver near Monica's car at the scene in the desert. Police also found eight latent prints on the hood of Monica's car that matched defendant.

She was taken to a hospital where her blood alcohol content measured .08 percent about three hours after the incident. Rachel testified that she received a call the next morning from Monica; Monica told her that the man they had met at the bar the previous evening had assaulted her.

At 7:10 the next morning, Monica called the detective and informed him that she had a napkin with an address the suspect had given her. Monica did not, however, give the napkin to the police for nearly two months, despite three or four efforts by the police to obtain it. At one point she said that she had given the napkin to Rachel. At trial, a handwriting expert could neither identify nor eliminate defendant as the author of the note on the napkin.

On April 29, about three weeks after the assault, Rachel and Monica were at the Sagebrush Cantina, where they were regulars who visited at least once a week. The bouncer at the Sagebrush testified that he knew defendant from the bar and that defendant was a regular there, particularly just before he was detained. However, no evidence showed that defendant, Rachel, or Monica knew each other from frequenting the Sagebrush. On the night of April 29, Rachel spotted defendant at the bar and informed the bouncer. A Tucson police officer was called, arrived, informed defendant of the allegations, and asked defendant if he would come to the station to give a statement.

Defendant agreed. Defendant denied any involvement and also denied having been in Sunny's Bar in the previous year and a half. An officer examined defendant's penis and observed no remaining cuts, scars, or marks.

At the station, Rachel picked defendant out of a photo lineup as the man they had met at Sunny's. Monica also identified defendant out of a photo lineup as the assailant.

Defendant's theory at trial was that he was not present at the crime scene with Monica and that she had wrongfully accused him because she had a jealous boyfriend waiting for her at home. According to defendant, Monica simply made up the accusation of sexual assault to cover up a consensual sexual act with someone else.

Not until the second day of trial did the prosecutor learn and disclose that Monica was enrolled in a methadone treatment program due to a ten-year heroin addiction. The state contended that evidence of the methadone program was irrelevant because Monica was a stabilized addict. With the jury absent, Monica testified that she did not remember if she was taking methadone in March or April, but that she had gone off it sometime during the prior six months (the trial was in September). She denied using heroin in March and April prior to the incident. She also testified that she did not use cocaine or any other drug on April 8 or 9. Based on her testimony, the trial judge precluded defendant from asking Monica about drug use during cross-examination and from mentioning drug use during closing argument.

Monica also did not reveal, prior to trial, that she has a foster brother named Danny Orantez, the name she had originally attributed to her attacker. Danny Orantez was in jail at the time of the incident and had been since the preceding November.

The jury convicted defendant of kidnapping and sexual assault, both found to be nondangerous offenses, and acquitted him of aggravated assault. In his motion for new trial, defendant argued, among other things, that because Monica was a heroin addict, because she may not have been taking her methadone, and because she had been drink-

ing on the day of the crimes, her ability to perceive, remember, and relate the incident was affected. Defendant requested Monica's methadone records. The trial court denied the motion for new trial, but ordered that the methadone treatment records be produced for defendant.

On January 24, 1993, defendant filed a motion to set aside the judgment, raising as newly discovered evidence Monica's history of lying to police and lawyers on other matters, her drug abuse and denial of drug abuse at trial, and evidence of prostitution to support defendant's alternate theory of consent. Defendant presented testimony that Monica had not visited the methadone clinic for her daily treatment on April 2 and 3. She came in on April 4 and received methadone for that day and the next. She did not receive doses for April 6, 7, or 8. On April 9 she came in for a dose. Monica's methadone program required a daily dose.

A dispensing nurse from the clinic testified that, although Monica told her she was not using heroin, she overheard Monica tell others in the clinic that she had been using heroin. The clinic administrator testified that because of the three-day absence from treatment (April 6–8), it was probable that Monica would have used heroin during that time.

Defendant also presented evidence that Monica gave a blood sample at approximately 4:00 a.m. on April 9, a few hours after the alleged assault. It was positive for cocaine, metabolites of cocaine, and morphine (morphine indicates use of heroin, codeine, or morphine, but not methadone). The test results meant that she used cocaine within six hours of the blood draw—sometime after 10:00 p.m. the night of the alleged assault.

Defendant also offered evidence that Monica told her methadone case administrator in March that she might have to engage in prostitution again to support her drug habit and, on April 20, 1992, less than two weeks after the alleged assault, she admitted to the administrator that she had been using heroin and was, in fact, practicing prostitution to support her habit.

In denying the motion to vacate the judgment, the trial judge concluded that the evidence of prostitution was inadmissible and that the evidence of drug use and lying about such use at trial would not have changed the verdict. The court of appeals affirmed.

## ISSUE

Whether the trial court should have granted a new trial based on newly discovered evidence that the state's sole witness was using heroin and cocaine at the time of the alleged assault.

## NEW TRIAL FOR NEWLY DISCOVERED EVIDENCE OF DRUG USE BY KEY WITNESS

 We analyze a trial court's decision on a motion for a new trial based on newly discovered evidence on an abuse of discretion standard. *State v. Fisher*, 176 Ariz. 69, 75, 859 P.2d 179, 185 (1993). The object in considering a new trial is to promote justice and protect the innocent. *State v. Clifton*, 134 Ariz. 345, 348, 656 P.2d 634, 637 (App. 1982). Defendant must show that (1) the newly discovered evidence is material; (2) the evidence was discovered after trial; (3) due diligence was exercised in discovering the material facts; (4) the evidence is not merely cumulative or impeaching, unless the impeachment evidence substantially undermines testimony that was of critical significance at trial; and (5) that the new evidence, if introduced, would probably change the verdict or sentence in a new trial. *See State v. Serna*, 167 Ariz. 373, 374, 807 P.2d 1109, 1110, *cert. denied*, 502 U.S. 875, 112 S.Ct. 214, 116 L.Ed.2d 172 (1991); *see also* Ariz. R.Crim.P. 24.2 & 32.1(e). Defendant has shown that the evidence was discovered after trial and with due diligence. Thus, we need to address whether the evidence was material, cumulative, impeaching, and, most importantly, whether the evidence would have probably changed the verdict.

## I. Material

 On a motion for new trial, evidence is material if it is relevant and goes to substantial matters in dispute or has a legitimate

and effective influence or bearing on the decision of the case. *United States v. Riggs,* 495 F.Supp. 1085, 1090 (D.Fla.1980); *see also* Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 81, at 160 (3d ed. 1991) (question of materiality subsumed in relevance rule).

█ In Arizona, specific acts of misconduct of a witness are inadmissible unless probative of truthfulness, except where the witness had been convicted of a crime. Ariz. R.Evid. 608–09; *State v. Harris,* 73 Ariz. 138, 142, 238 P.2d 957, 959 (1951). Monica's drug use is material to her credibility as the state's key witness. *Cf. United States v. Kearney,* 420 F.2d 170, 174 (D.C.Cir.1969) (although the court may not prohibit probing of narcotic use by the state's sole eyewitness, "the matter of drug addiction . . . is properly approached with awareness of the potential for prejudice of the jury.").

## II. Cumulative

█ Newly discovered evidence is not grounds for a new trial if it is merely cumulative. In this case, however, the jury heard no evidence of drug use because the trial court precluded it.

Regarding Monica's perjurious testimony concerning drug use, the state claims that Monica's veracity was already sufficiently in question because she admitted lying to police. Although she admitted lying about her abduction and presented a reason for changing her story at trial, this varies greatly from evidence of drug use at the exact time of the incident and of lying under oath about it at trial.

█ Perjurious testimony by a witness does not automatically result in a new trial. *State v. Schroeder,* 100 Ariz. 21, 22–23, 409 P.2d 725, 726 (1966). But the Fifth Circuit Court of Appeals, in a very similar case in which the sole witness to a murder had lied by saying that she had not been to her methadone clinic hours before the crime, stated:

> Whether . . . the only eyewitness[ ] had ingested drugs sufficient to interfere with her ability to identify the murderer was of obvious relevance and evidence which . . .

should have been presented to the trier of fact. . . .

*Williams v. Whitley,* 940 F.2d 132, 134 (5th Cir.1991); *see also United States v. Harris,* 542 F.2d 1283, 1303 (7th Cir.1976) (fact that witness was a heroin addict "was a matter of credibility for evaluation by the jury."), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). Thus, evidence of lying about drug use is not cumulative.

## III. Impeaching

During trial, after the prosecution revealed that Monica participated in a methadone treatment program, defendant sought to impeach the witness regarding her drug use. At the hearing, outside the presence of the jury, the witness stated that she did not use cocaine and that she had not taken heroin during the days before the alleged assault. Newly discovered evidence showed that she had taken cocaine, was absent from her methadone program, and was most likely using heroin.

The comment to Rule 32.1(e), Ariz.R.Crim. P., states,

> Impeachment evidence will rarely be of a type which would probably have changed the verdict at trial. However, where newly-discovered impeachment evidence substantially undermines testimony which was of critical significance at trial, the court should evaluate whether relief should be granted on the grounds that the evidence probably would have changed the result.

█ Evidence of intoxication at the time of observation is admissible to attack a witness on her ability to perceive and remember. *State v. Wargo,* 145 Ariz. 589, 590, 703 P.2d 533, 534 (App.1985); *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987) ("A witness' use of drugs is only relevant as to the ability of the witness to perceive the underlying events and testify lucidly at trial."). We have previously noted that cocaine "affects the mental state of a user . . . often producing a toxic psychosis, including bizarre mental states and abnormal behavior." *State v. Plew,* 155 Ariz. 44, 48, 745 P.2d 102, 106 (1987).

If the jury had known that the victim had missed several methadone doses at the time in question and thus likely had used heroin, and had known that Monica had consumed cocaine as well as alcohol within hours of the alleged incident, defendant could have argued more persuasively that her ability to perceive, remember, and relate was inhibited by drug use. *See State ex rel. Romley v. Superior Court,* 172 Ariz. 232, 236, 836 P.2d 445, 449 (App.1992) ("[I]f a trial court excludes essential evidence, thereby precluding a defendant from presenting a theory of defense, the trial court's decision results in a denial of defendant's right to due process that is not harmless."); *see also State v. Mata,* 125 Ariz. 243, 244, 609 P.2d 58, 59 (upholding trial court's rejection of proffered testimony of victim's statement that she had previously prostituted herself with murder defendant for heroin in part because statement was made while victim was high on heroin and thus was unreliable hearsay), *cert. denied,* 449 U.S. 921, 101 S.Ct. 322, 66 L.Ed.2d 150 (1980). As Monica's testimony was critical to the prosecution, her ability to recall and relate was also critical. *See Williams v. Whitley,* 940 F.2d at 133–34 (methadone use by sole witness implicated her ability to perceive).

**IV. Probability of Changing the Verdict**

■ A new trial will be granted only if the introduction of new evidence would probably change the verdict or sentence. *See Ariz. R.Crim.P.* 24.2 & 32.1(e); *see United States v. Wallach,* 935 F.2d 445, 456–57 (2d Cir. 1991); *Fisher,* 176 Ariz. at 75, 859 P.2d at 185; *State v. Hickle,* 133 Ariz. 234, 238, 650 P.2d 1216, 1220 (1982); *State v. McAvaney,* 106 Ariz. 149, 150, 472 P.2d 18, 19 (1970); *State v. Sneed,* 98 Ariz. 264, 271, 403 P.2d 816, 821 (1965). Although other witnesses placed defendant at Sunny's and although defendant's fingerprints were found on the victim's car (defendant later challenged the fingerprint evidence), the victim was the only one who positively linked defendant to the crime itself. "The accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against [defendant]." *Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). As the only witness to the alleged crime,

evidence that would cause a jury to question her ability to perceive, remember, and relate would have likely resulted in a different verdict.

■ Evidence that Monica lied to the jury regarding drug use, coupled with evidence that she had drugs in her system, would have given the jury more reason to question her testimony and version of events. *See Wallach,* 935 F.2d at 458 (finding that "despite the presence of other impeaching material ... the disclosure of the witness' false statements would have had a tremendous impact on the jury's credibility assessment of the witness."); *United States v. Davis,* 473 F.2d 1023, 1025 (10th Cir.1973) (requiring the issue of truthfulness of the witness be presented fully to the jury). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence...." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Such evidence would have boosted defendant's theory of wrongful accusation. *See Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111 (concluding that "jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony."). Therefore, we hold that the newly discovered evidence of drug use and of lying about drug use would have probably changed the verdict.

**REFERENCES TO PROSTITUTION**

The trial judge ruled that newly discovered evidence of the witness' statements concerning prostitution to support her drug habit would not have been admissible at trial. The court of appeals agreed. In part, we also agree. *See State ex rel. Pope v. Superior Court,* 113 Ariz. 22, 28–29, 545 P.2d 946, 952–53 (1976) (holding that generally, evidence in a rape case is inadmissible to demonstrate the alleged victim's unchastity).

■ There is an exception to the *Pope* rule of inadmissibility when a defendant claims the encounter was a consensual act with a prostitute. *Id.* at 29, 545 P.2d 946. Because defendant denied being with the victim the night of the crime, and because he did not claim that she had consented to sex

*with him*, the trial court properly concluded that the evidence of prostitution would not have been admissible under the consent exception of *Pope. See State v. Williams*, 128 Ariz. 453, 454, 626 P.2d 617, 618 (App.1981).

However, admissions concerning prostitution under the circumstances in which such admissions were made in this case are possibly relevant on the issue of drug use by the victim. Arguably, such evidence could have been helpful to the jury in ascertaining the witness' ability to observe, recall, and relate the events of the evening. Because the trial court believed the admissions to be totally inadmissible under *Pope*, it apparently did not independently weigh their possible admissibility on the issue of drug use. On remand, it may do so. Of course, even if the trial court determines the statements to be relevant on the issue of drug use, it may nevertheless exclude them if it determines that their prejudicial effect outweighs their probative value. Rule 403, Ariz.R.Evid.

### CONCLUSION

At least two of the three categories of newly discovered evidence—drug use and lying about drug use—are relevant to the extent that they call into question the victim/witness' ability to observe, recall, and relate the events of the evening. We hold the evidence to be newly discovered and material, that defendant exercised due diligence, that the evidence is not merely cumulative or impeaching, and that the evidence probably would have changed the verdict.

With respect to the third item—references to prostitution—the trial court, on remand, may reconsider the issue of relevance. If determined to be relevant, the trial court may nevertheless consider exclusion of such evidence as unduly prejudicial under Rule 403, Ariz.R.Evid.

We vacate the memorandum decision of the court of appeals and remand for a new trial consistent with this opinion.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.