303 P.3d 94

**STATE of Arizona, Appellee,**

v.

**Josef Alexander ARVALLO, Appellant.**

**No. 1 CA–CR 11–0193.**

Court of Appeals of Arizona,
Division 1, Department A.

June 11, 2013.

zona Supreme Court Order filed December 12, 2012.

Thomas C. Horne, Arizona Attorney General by Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section and Craig W. Soland, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Droban & Company, PC by Kerrie M. Droban, Anthem, Attorneys for Appellant.

**OPINION**

SWANN, Judge.

¶ 1 Defendant, Josef Alexander Arvallo, appeals from his convictions on two counts of first degree murder, each a Class 1 dangerous offense; two counts of attempted armed robbery, each a Class 3 dangerous offense; and two counts of kidnapping, each a Class 2 dangerous offense. We conclude that the trial court properly denied Defendant's motions for mistrial and new trial, and therefore affirm.

¶ 2 The offenses arise from an incident that occurred at a carwash in north Phoenix on March 6, 2007, when Defendant shot and killed two young men during a "planned faked robbery" of a drug deal that Defendant engineered with his friend, Tomas Rodriguez.[1]

¶ 3 A jury found Defendant guilty of all of the offenses as charged. The trial court sentenced Defendant to natural life on each of the first degree murder counts, to be served consecutively; concurrent, presumptive sentences of 11.25 years on each of the attempted armed robbery counts; and concurrent, presumptive sentences of 15.75 years on each of the kidnapping counts.

¶ 4 Defendant timely appeals. We have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1), 13–4031, and 13–4033.

---

1. We view the evidence in the light most favorable to sustaining the jury's convictions and resolve all reasonable inferences against the defen-

¶ 5 On appeal, Defendant argues that the trial court abused its discretion when it denied his motions for: (1) mistrial based on a jury question; (2) mistrial based on prosecutorial misconduct; and (3) a new trial based on the state's failure to disclose *Brady* material. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For reasons set forth below, we affirm.

*STANDARD OF REVIEW*

¶ 6 We review a trial court's denial of a motion for mistrial for an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32, 4 P.3d 345, 359 (2000). A trial court's discretion in such matters is broad because the trial court "is in the best position to determine whether the evidence will actually affect the outcome of the trial." *Id.* Therefore, its decision will be overturned on appeal "only if it [is] 'palpably improper and clearly injurious.'" *State v. Murray*, 184 Ariz. 9, 35, 906 P.2d 542, 568 (1995) (citation omitted). "A declaration of a mistrial is a most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *Id.* (citation omitted).

¶ 7 "A denial of a motion for new trial will be reversed only when there is an affirmative showing that the trial court abused its discretion and acted arbitrarily." *State v. Mincey*, 141 Ariz. 425, 432, 687 P.2d 1180, 1187 (1984). An abuse of discretion occurs when "the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice." *State v. Chapple*, 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983).

*DISCUSSION*

**I. MOTION FOR MISTRIAL BASED ON JUROR QUESTION**

¶ 8 "The cases are legion that a defendant is entitled to a fair, impartial and unbiased jury." *State v. Rojas*, 177 Ariz. 454, 457, 868 P.2d 1037, 1040 (App.1993). "[J]uror misconduct warrants a new trial if

---

dant. *State v. Manzanedo*, 210 Ariz. 292, 293, ¶ 3, 110 P.3d 1026, 1027 (App.2005).

the defendant shows actual prejudice *or if prejudice may be fairly presumed from the facts.*" *State v. Eastlack,* 180 Ariz. 243, 256, 883 P.2d 999, 1012 (1994) (citation omitted). Even a juror who expresses an opinion about the guilt or innocence of a defendant before a trial is completed may nevertheless continue to hear the case as long as that juror keeps an open mind and retains a willingness to alter the opinion after hearing all of the evidence. *Rojas,* 177 Ariz. at 458, 868 P.2d at 1041.

¶ 9 Katie, the person who set up and participated in the drug deal, was granted immunity by the state and testified at trial as an eyewitness to the shooting. In her testimony, she acknowledged that she had lied to detectives when she was initially interviewed, but asserted that she had subsequently told them the truth about the shooting in a second interview that she initiated with the police.

¶ 10 During cross-examination, defense counsel reviewed with Katie, at length and in detail, the terms of her immunity agreement and the numerous lies she had told the detectives during her first interview. In response to the questions about why she lied, Katie repeatedly testified that she felt her life and her family were in danger because Tomas Rodriguez had threatened her. To rehabilitate the witness on redirect, the prosecutor asked Katie to explain why she had initially lied to police. Katie stated that Tomas had told her that, if she "said anything to anyone, he'd come after me and my family," and she had believed him because she had "watched two of his people kill two of my friends." Katie also testified that, while she had initially been worried about having her name and address appear in police reports, she had ultimately made the choice to come forward and tell the truth.

¶ 11 At the end of Katie's testimony, Juror 10 submitted the following question:

This is disturbing. A lot of us are concerned about anonymity. Are our identities as jurors public record? Will the defendant's family, etcetera [sic], friends have access to our information? Who exactly has our information?
Thank you, your honor.

We would prefer if you not discuss this in front of the defendant or any of his family and friends.

The trial court informed counsel at a sidebar that its usual response to such a question was "[t]hat the jury list is sealed, never to be reopened, except by order of the court." Defense counsel was not satisfied with this solution, noting that she had concerns on several levels because the note implied not only that the jurors had concerns for their personal safety, but also that they were discussing those concerns amongst themselves. The trial court then dismissed the jurors for the day, counsel moved for a mistrial, and the court set a hearing on the motion for the next morning.

¶ 12 The next morning, after considering supplemental briefing and hearing additional argument from both counsel, the trial court called the entire jury into the courtroom to question the jurors about the note. The court did not read the actual note to the jurors but stated that "we are concerned with a note we [have] received from a juror, apparently expressing personal safety concerns, and the note specifically say[s], a lot of us are concerned." The trial court also explained that it could not "accede to the request in the note not to discuss the [matter] with all parties present," as "that would, in itself, create a mistrial" because "[a]ll must be present and hear the entire proceeding we are having." The court then informed the jurors that jury lists were sealed by statute and not available to the public. It added that the jurors' identities were protected and they were known only by number for the present proceedings, the jury commissioner could not dispense anyone's personal information without a court order, and the biographical information used by the attorneys during jury selection had already been shredded.

¶ 13 The court next asked the jurors a series of questions, including whether there was anyone who could no longer be fair and impartial, whether anyone could no longer apply the instructions given them ("especially the presumption of innocence instruction"), and whether anyone had any concerns and needed to meet with the court and parties

individually. The court also specifically asked the jurors whether they had discussed any of the facts of the case. After receiving no positive answers to any of these questions, the trial court instructed the jurors that they were to return to the jury room for five minutes "to write whatever you want on any note. It's just crucial that you remain fair and impartial." After the appropriate time had elapsed, the trial court had not received any additional notes or comments. It therefore denied Defendant's motion for mistrial and the proceedings resumed.

¶ 14 On appeal, Defendant contends that the juror's "collective note" demonstrates the jurors could not be fair and impartial; that the trial court's "perfunctory *voir dire* of the panel regarding their safety concerns ... did nothing to [persuade the jury] that [Defendant] was no threat"; and that the trial court's "insistence" that Defendant had a right to be present at every proceeding precluded the possibility that any juror would "speak up" about their concerns when they had already informed the court that they did not wish Defendant to be present. Defendant also contends that the trial court's questioning did not "unring the bell" that Defendant was "an imposing, terrifying figure," and that the court therefore erred in denying a mistrial.

¶ 15 Defendant argues that we must presume from the juror's question, in particular its use of the terms "we" and "us," that the jurors were biased against Defendant because of their fear of him and that the trial court's actions in this case did nothing to remedy that situation. We disagree.

¶ 16 First, there is no indication in the record that Juror 10 actually communicated his or her concerns to the other jurors or that any jurors discussed the issue of their safety. The fact that Juror 10 couched the question to the court in terms of "we" and "us" may simply have been a stylistic choice and an empathic generalization of his or her own personal concerns. But even assuming there was a discussion of the issue among some members of the jury, a mistrial was not warranted.

¶ 17 Here, the trial court did not identify Juror 10 as the author of the note to the

jurors when addressing, in open court, the concerns about personal safety expressed in the note. Instead, the court addressed general safety concerns by explaining the measures that preserve the confidentiality of any personal information submitted for jury selection purposes. While jurors are not permitted to discuss the facts or draw a conclusion about a defendant's guilt before the conclusion of trial evidence, nothing prohibits them from asking the trial court for clarification of the potential use of their personal information. The fact that the court here addressed the safety concerns in the presence of Defendant was not only required, but appropriate because removing Defendant from the proceedings may well have created a perception that the court considered him a threat.

¶ 18 The trial court specifically questioned the jurors several times about whether they had discussed the facts of the case and whether any one of them felt, at that point, that he or she could no longer be fair and impartial and apply the presumption of innocence standard as instructed. All of the jurors affirmed that they had not discussed the facts of the case and also confirmed their ability to continue to be fair and impartial and follow the court's instructions. And after addressing them in open court, the court gave the jurors the additional option of retiring to the jury room and expressing "whatever you want on any note," out of the presence of Defendant. None of the jurors submitted any additional questions or comments. Had any juror viewed Defendant as so dangerous that he or she could not speak up in court, the juror could have expressed any concern in an anonymous note.

¶ 19 We find *Rojas,* on which Defendant relies, easily distinguishable from this case. In *Rojas,* while walking out to deliberate, a juror gave the bailiff $20 to give to the victims along with a note telling them that "it took great courage to come to court and testify in front of a jury" and that he was "proud" of them. 177 Ariz. at 456, 868 P.2d at 1039. The court denied a motion for mistrial and declined to interview the juror until after the jury returned a guilty verdict. *Id.* We reversed, holding that upon learning

of the note, the trial court in *Rojas* should have immediately stopped the deliberations, questioned the juror, and determined whether the deliberations should have proceeded. *Id.* at 458–59, 868 P.2d at 1041–42. We also found that the juror's expression of impartiality was elicited through the trial court's leading questions and that it was "on its face irreconcilable" with what the juror actually did in praising the victims and sending them money. *Id.*

¶ 20 Here, the trial court posed no leading questions when questioning the jury panel, and Juror 10's question did not "on its face" express a clear bias either for or against any party. And unlike in *Rojas*, the judge addressed the juror's question early in the course of the trial. Given that the safety question arose so early in the trial, it is more likely that a juror who truly felt that Defendant was "definitely guilty" and also "dangerous" to him or her personally, as Defendant suggests, would have attempted to be relieved of further service.[2]

¶ 21 We conclude that the trial court thoughtfully conceived and implemented appropriate steps to address the juror's concern, and that Defendant was not prejudiced in the process. We find no abuse of discretion in the court's denial of the motion for mistrial based on the juror question.

## II. MOTION FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT

■ ¶ 22 On April 19, 2007, the state filed its Rule 15.1(b) supplemental disclosure in which it identified Phoenix Police Department Detective Cliff Jewell as a witness. The motion also stated that "[a]ny police officer listed above may be called as an expert witness with respect to an area within the officer's training and experience, including expert knowledge of illegal drugs, their possession or sale, usable amounts, or any other topic."

¶ 23 In January 2008, a defense investigator interviewed Detective Jewell without the defense attorney present. At Defendant's first trial, which ended in a hung jury, Jewell testified regarding his observations of the crime scene, that he had extensive training with regard to firearms dating back to his military experience, and that he was currently a firearms instructor for the police department.[3]

¶ 24 Defense counsel only objected to Jewell's testimony when he was asked to give his observations about the x-rays of someone who was shot with a shotgun. The objection was on the grounds that Jewell had not been disclosed by the state as an expert, and none of his testimony was mentioned in his interview or contained in his short written report, and it was unfair to "ambush the defense" by allowing him to testify as an expert. The state countered that the testimony was within Jewell's basic knowledge as an experienced homicide detective. The trial court sustained defense counsel's objection, finding that Jewell's testimony did "contain some element of expertise and special knowledge" that required "some disclosure ... under 15.1."

¶ 25 After the first trial, the state asked Jewell to prepare a supplemental report.[4] Defense counsel interviewed Jewell a second time in October 2009, and questioned him about the information in his supplement.

¶ 26 Jewell testified at the second trial, consistent with his earlier testimony and with

---

2. To be sure, it is unfortunate that any juror was placed in a position in which he or she perceived a need to consider personal security. But that concern was not born of juror misconduct—it was a consequence of properly presented evidence concerning threats and violent conduct that necessarily arises in some criminal cases. The trial court here properly took steps to ensure that the jury was fair and impartial within the meaning of the law, not that it was numb to the significance of the testimony it heard.

3. The observations included the conclusions he had drawn from his assessment of the "four assault rifle bullet strikes" to the victims' vehicle and the "differences between what you would see with a shotgun as opposed to ... a rifle such as AK–47 or SKS."

4. In his supplemental report, Jewell noted that the victims had "massive high velocity wounds consistent with having been caused by a large caliber rifle." The type of the bullet casing was that "typically used in 'SKS' or 'AK–47' assault rifles."

the information contained in his supplemental report. The day after Jewell testified, defense counsel moved to strike his testimony, arguing that he had not been disclosed as an expert witness and that she "had no idea that [Jewell] was going to be testifying to those specific items."[5] In the alternative, defense counsel moved for a mistrial or for a continuance in order to retain a defense expert.[6] The trial court took the motion under advisement and also ordered the transcript of Jewell's testimony at the first trial.

¶ 27 The trial court held two hearings on the motion, including an evidentiary hearing at which it heard testimony from Jewell. The court also reviewed the transcripts of Jewell's testimony at both trials, as well as those of other witnesses, and set out in extensive minute entries the discussions and arguments held on the issue. At the conclusion of the evidentiary hearing, the trial court denied the motion for mistrial, finding that while Jewell was "probably insufficiently disclosed as an expert," it was a "no harm no foul situation" because his testimony about the four shots and four trigger pulls was "previously known or disclosed to the defense and testified to at trial" and another witness at trial had also testified that Defendant used a semiautomatic rifle. The court also found no prosecutorial misconduct.

¶ 28 On appeal, Defendant argues that (1) he was deprived of a fair trial by the prosecutor's willful misconduct in failing to disclose Jewell as an expert; (2) he had no warning of the "four trigger pulls" testimony; and (3) the trial court's denial of a mistrial was an abuse of its discretion.

¶ 29 We conclude that the trial court committed no reversible error by denying the motion for mistrial based on prosecutorial misconduct. Even assuming inadequate written disclosure concerning the scope of Jewell's testimony, it became patently clear at Defendant's first trial that the state intended to use him as an expert witness regarding firearms and weapons. And Jewell's supplemental report, in which he explained his assessment of the type of weapon used, the number of shots fired, and the trajectory and distance of the shots leading to the "four bullet holes" based on his observations of the crime scene, left no doubt about the nature of his anticipated testimony. Moreover, Defendant had an opportunity to interview Jewell twice, including an interview after he had submitted his supplemental report.

¶ 30 Defendant does not argue that he was not provided with all of the necessary crime scene evidence, reports and photographs available to the state, or that he did not know that the state would present testimony to establish that he used an AK–47. Instead, Defendant argues that the state should have told him that Jewell planned to testify that the shooter used a semiautomatic weapon and likely pulled the trigger four times. But there is nothing in Rule 15.1 that requires such a detailed script of a witness's testimony. We conclude that the trial court investigated this issue thoroughly and properly denied the motion for mistrial.

## III. MOTION FOR NEW TRIAL BASED ON THE FAILURE TO DISCLOSE BRADY MATERIAL

¶ 31 In January 2010, the Phoenix Police Crime Scene Specialist (criminalist) assigned to this case testified about her processing of the crime scene. In February 2010, two days after the jury rendered its verdicts in this case, the prosecutor learned that an article appeared in the *Arizona Republic* concerning an ongoing labor dispute between the criminalist and the Phoenix Police Department crime lab. The prosecutor also received an e-mail from her supervisor indicating that the crime lab was investigating the criminalist's work in the present case and had identified "several errors in her reports." While some of the errors were "minor and administrative in nature" (dates,

---

5. Defense counsel moved to strike based on Jewell's testimony regarding the type of weapon used in these offenses and comparing semiautomatic with automatic weapons. He also testified that it would take four trigger pulls to do that type of damage to the window, and that the shooter had to be moving when firing the weapon.

6. Defense counsel subsequently withdrew her requests to strike and for a continuance and pursued only the motion for mistrial.

time, etc.), others might require "some further explanation or photography reference." The prosecutor promptly disclosed this matter to the trial court and to counsel for Defendant.

¶ 32 After an in camera review of materials provided by the state, the trial court ruled that the "materials contain[ed] information which is exculpatory or affects the credibility of a prosecution witness," and ordered the state to disclose a copy of the materials to defense counsel. The next day, defense counsel moved for a new trial arguing, among other things, that the state violated *Brady* by not disclosing the criminalist matter earlier.

¶ 33 Between March 2010 and February 2011, the trial court held numerous hearings on the matter, including evidentiary hearings at which it heard testimony from officers, the criminalist, the prosecutor's supervisor and the prosecutor. The court also reviewed transcripts of interviews with relevant members of the police department and the county attorney's office, as well as the transcript of the criminalist's testimony at trial.

¶ 34 The court ruled that while there should have been earlier disclosure regarding the criminalist's errors in other cases before her testimony in this case, there was "no purposeful delay [by the state] and ... the errors, in the court's view, had no import on the jury's verdicts." It further found that there was "no reasonable probability that the result of the trial would have been different if such evidence had been disclosed to the defense prior to or during the trial." The court explained its decision in a thorough minute entry in which it noted that there was eyewitness testimony of the shooting, and that Jewell's testimony at trial was based upon his own examination of the crime scene on the night of the crime, as well as on photographs taken by "another technician"— not the criminalist—that "accurately portrayed the evidence." The court also found that "[a]ny discrepancies between [the criminalist's] notes and her reports played no role in the jury's decision or impacted it in any way."

¶ 35 Defendant argues on appeal that the criminalist's involvement in this case was not as minimal or insignificant as the trial court determined, and that had he been privy to her "work history and inaccurate reporting," he "could have used the information to impeach [her] credibility and cast doubt on Detective Jewell's findings," because Jewell relied on her work.

¶ 36 We find no abuse of discretion. A *Brady* violation occurs only when the prosecutor, without regard to good faith or bad faith, withholds evidence that is material to a defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To warrant a new trial, impeachment evidence must "substantially undermine[ ] testimony that was of critical significance at trial." *State v. Orantez*, 183 Ariz. 218, 221, 902 P.2d 824, 827 (1995).

¶ 37 We have reviewed the record and find that it amply supports the trial court's ruling in this case. The criminalist's testimony was not of critical significance in the case. Jewell testified about his personal observations of the evidence at the scene, the photographs of the crime scene were accurate and were available to the parties and the jury, and nothing about the crime scene itself—other than the shell casings and the bullet impacts to the vehicle—was relevant to the crime.

¶ 38 We note that the trial court took the appropriate steps to ensure that a *Brady* violation had not occurred. It held numerous hearings regarding the matter, reviewed numerous transcripts of interviews with relevant witnesses, and made appropriate findings that the criminalist's testimony was not material to the case. We conclude that the trial court did not err by denying the motion for new trial.

### CONCLUSION

¶ 39 For the foregoing reasons, we affirm Defendant's convictions and sentences.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge and THOMAS C.

KLEINSCHMIDT, Judge Pro Tempore.*

* The Honorable Thomas C. Kleinschmidt, Judge (Retired) of the Court of Appeals, Division One, is authorized by the Chief Justice of the Arizona Supreme Court to participate in the disposition of this appeal pursuant to the Arizona Constitution, Article 6, Section 3, and A.R.S. §§ 12–145 to –147 (2003).