.
NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

VINCENT MILO GRIEGO, *Appellant.*

No. 1 CA-CR 16-0174
No. 1 CA-CR 16-0617
Consolidated
FILED 11-2-2017

Appeal from the Superior Court in Maricopa County
No. CR2013-449964-003
The Honorable Alfred M. Fenzel, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Guy Brown, PLLC, Phoenix
By Guy F. Brown
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Thomas C. Kleinschmidt[1] and Judge Jon W. Thompson joined.

---

**J O N E S**, Judge:

¶1        Vincent Griego appeals his convictions and sentences for first-degree murder, burglary in the first degree, kidnapping, attempted armed robbery, aggravated assault, and disorderly conduct.  For the following reasons, we affirm Griego's convictions and affirm his sentences as modified.

**FACTS[2] AND PROCEDURAL HISTORY**

¶2        In late September 2013, Ricardo Martinez and Rafael Machado approached Jose Ochoa Torres and asked him to assist them with a home invasion.  Martinez and Machado drove Torres by the target house and explained they expected to find at least ten pounds of marijuana and $10,000 cash inside.  After meeting with the men, Torres, who was already working as a confidential informant, relayed the home invasion plans to detectives and identified the target house.  Torres agreed not to participate in the invasion or answer the phone if Martinez or Machado contacted him.

¶3        On September 30, 2013, a police detective contacted three residents of the target house, E.M., C.M., and their adult grandson, A.M., and advised them he had reason to believe they may be the targets of a home invasion.  Believing the detective's warning was mere subterfuge to gain access to their home and investigate their own drug use, the residents did not leave the home or otherwise act upon the warning.

---

[1]      The Honorable Thomas C. Kleinschmidt, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3, of the Arizona Constitution.

[2]      "We view the facts in the light most favorable to sustaining the convictions with all reasonable inferences resolved against the defendant." *State v. Harm*, 236 Ariz. 402 n.2, 404, ¶ 2 (App. 2015) (quoting *State v. Valencia*, 186 Ariz. 493, 495 (App. 1996)).

¶4           Shortly after midnight on October 1, 2013, C.M. awoke to someone kicking the side door of her home, which led directly to her bedroom.  As she jumped out of bed in response, she heard a second kick.  When the door "flew open," she saw a man pointing a gun directly at her.  Instinctively, C.M. swatted the gun away and hid behind the door.

¶5           At that point, E.M. awoke and "tussl[ed]" with a gunman while C.M. ran to a bedroom occupied by A.M. and his girlfriend, A.C., and yelled, "home invasion."  Awakened by C.M.'s screaming, A.C. sat up in bed and saw a light shining from the darkened hallway.  Within seconds, the gunman entered the bedroom, pointed the gun at A.C., and ordered her to the ground.  Before A.C. could move, E.M. yelled from the hallway, "I told you there is no drugs," which attracted the gunman's attention.  The gunman returned to the hallway, shot E.M., and knocked down C.M. as he ran outside.

¶6           Awakened by the gunshot, A.M. jumped out of bed, but by the time he ran from his bedroom, the gunman had already fled from the residence.  A.M. called 9-1-1, and police and emergency responders arrived shortly thereafter.  Notwithstanding the life-saving efforts performed by medical personnel, E.M. died from a gunshot wound to his chest.

¶7           Less than a week later, Torres, acting at the direction of the police, again met with Martinez and Machado.  While wearing a wire, Torres discussed the home invasion with the men.  Martinez and Machado explained Griego assisted them in Torres's place and shot E.M. "on his own."

¶8           Based upon this evidence of Griego's involvement, police officers executed a search warrant on Griego's residence and seized sneakers consistent with the footprint left on the victims' side door.  The State then charged Griego with one count of first-degree, felony murder (Count 1), one count of burglary in the first degree (Count 2), four counts of kidnapping (Count 3 — victim E.M.; Count 4 — victim C.M.; Count 5 — victim A.C., Count 6 — victim A.M.), four counts of armed robbery (Count 7 — victim E.M.; Count 8 — victim C.M.; Count 9 — victim A.C.; Count 10 — victim A.M.), three counts of aggravated assault (Count 11 — victim C.M.; Count 12 — victim A.C.; Count 13 — victim A.M.), and one count of disorderly conduct (Count 14).

¶9           At trial in June 2015, the surviving victims were unable to identify the gunman, explaining a bandana covered most of his face and a bright light attached to his weapon obscured his appearance in their

otherwise unlit home.  Several other witnesses, however, identified Griego as a participant in the home invasion and the shooter.

¶10          David Ochoa testified he assisted Machado, Martinez, and Griego with the home invasion by driving the get-away car.[3]  Ochoa explained that each of the men was armed but only Griego's weapon had a light attached.  Although he never exited the vehicle, Ochoa saw Martinez, Machado, and Griego approach the victims' house, heard the door break open, and, moments later, heard a shot fired.  Immediately, the three men ran back to the car and Ochoa "took off."  Ochoa testified that as they sped away, Griego stated, "I shot him.  I shot him."  Later, Griego stated he shot E.M. because he "had to blow some steam."

¶11          Martinez and Machado testified consistently with Ochoa's testimony.  They enlisted Griego's participation in the home invasion after they could not reach Torres on the night in question.  They explained that only Griego carried a firearm equipped with a light and that he kicked in the side door, entered the home, and shot E.M.  Indeed, Martinez and Machado claimed they froze when they saw C.M. and remained at the doorway threshold until they heard the gunshot.  The men confirmed Griego's claim that he shot E.M. because he needed to "blow off steam."

¶12          After the State presented its case-in-chief, the trial court granted, in part, Griego's motion for judgment of acquittal, dismissing Count 6, kidnapping of A.M.  The jury convicted Griego of all remaining charges.  The trial court subsequently imposed a life sentence without the possibility of parole for twenty-five years on Count 1 (with 867 days' presentence incarceration credit)[4]; concurrent, presumptive terms of ten and one-half years' imprisonment on Counts 2, 3, 4, 5, 7, 8, 9, and 10;

_____

[3]       The State filed the same charges identified in ¶ 8, *supra*, against Machado, Martinez, and Ochoa.  Each of the codefendants pleaded guilty to lesser charges in exchange for their testimony against Griego.

[4]       As noted by the State, the applicable sentence for first-degree, felony murder is life imprisonment without the possibility of release "on any basis until the completion of the service of twenty-five calendar years," Ariz. Rev. Stat. (A.R.S.) § 13-751(A)(3) (2017), and we modify the judgment accordingly, *see* Ariz. R. Crim. P. 31.17(b) (authorizing the appellate court to modify a judgment); A.R.S. § 13-4037(A) (2017) (authorizing an appellate court to "correct" an illegal sentence).

concurrent, presumptive terms of seven and one-half years' imprisonment on Counts 11, 12, and 13; and a concurrent, presumptive term of two and one-quarter years' imprisonment on Count 14. Griego timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1),[5] 13-4031, and -4033(A)(1).

**DISCUSSION**

## I.        Denial of Motion to Vacate Judgment

**¶13**        Griego contends the trial court improperly denied his motion to vacate the judgment on the ground that newly disclosed evidence undermines the verdicts. We review the denial of a motion to vacate judgment for an abuse of discretion. *State v. Parker*, 231 Ariz. 391, 408, ¶ 78 (2013) (citing *State v. Orantez*, 183 Ariz. 218, 221 (1995)). "We afford trial judges great discretion given their 'special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record.'" *Id.* (quoting *Reeves v. Markle*, 119 Ariz. 159, 163 (1978)).

**¶14**        On August 23, 2013, more than a month before Martinez and Machado approached him regarding the home invasion at issue, Torres entered a plea agreement in an unrelated matter, which the trial court accepted. Pursuant to the terms of the agreement, Torres pled guilty to one count of attempted burglary in the second degree, the State dismissed two other charges, and the parties stipulated that Torres would be placed on supervised probation for an unspecified period.

**¶15**        At trial in the immediate case, the prosecutor questioned Torres regarding that plea agreement, and Torres acknowledged he had previously been arrested for burglary and pled guilty. He also testified he entered the plea agreement before he spoke with the State regarding the home invasion at issue here and explained he had not yet agreed to testify. Nonetheless, he acknowledged that, at the time of Griego's trial, sentencing on the first matter was still pending and he remained "at the mercy of the State."

**¶16**        What Griego asserts as "newly discovered evidence" is an email disclosed by the prosecutor three months after the jury returned its guilty verdicts, but prior to sentencing. The email, which the prosecutor had only that day been "made aware of," was dated November 2, 2013 and

---

[5]        Absent material changes from the relevant date, we cite a statute's current version.

sent from another deputy county attorney to defense counsel representing Torres in the burglary matter. It stated: "We need to continue sentencing one more time for another 30 days. There's a lot of moving parts to getting a solid deal in place due to the nature of your client's information (but a better deal is coming)."

¶17        After this disclosure, Griego moved to vacate the judgment, arguing the State had committed a *Brady* violation. *See generally Brady v. Maryland*, 373 U.S. 83 (1963) (holding the prosecution violates due process by withholding evidence favorable to the accused). At a hearing on the motion, defense counsel asserted the nondisclosure "hampered" Griego's defense, arguing that, had he known of the email at the time of trial, he would have used it to impeach Torres. In response, the prosecutor argued there was no evidence the State offered Torres a "better deal," defense counsel had a full opportunity at trial to cross-examine Torres regarding his plea agreement and the delayed sentencing, and Torres's testimony was not of "critical significance" and "simply served as [the] framework for the testimony of other witnesses." After hearing from both parties, the trial court denied the motion to vacate, stating there was no basis to conclude the undisclosed information would have affected the outcome of trial and characterizing any alleged prejudice as mere "speculation."

¶18        To satisfy its disclosure requirements under *Brady*, the government is required to disclose all "evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97, 121 (1976), and *Brady*, 373 U.S. at 87). Accordingly, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,'" the government must disclose all evidence affecting the witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

¶19        To establish a "true *Brady* violation," a defendant must show: (1) the undisclosed evidence is favorable, either because it is exculpatory or impeaching, (2) the State suppressed the evidence, either willfully or inadvertently, and (3) the nondisclosure caused the defendant prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury." *State v. Jessen*, 130 Ariz. 1, 4 (1981) (citing *Agurs*, 427 U.S. at 112). The "mere possibility" that undisclosed information may have helped the defense or otherwise affected the trial outcome does not establish prejudice. *Agurs*, 427 at 109-10.

6

¶20        Applying these principles here, Griego has failed to establish a *Brady* violation.  First, on this record, it is not clear the "information" referenced in the undisclosed email even pertained to this case.  As noted by the State, Torres was already enlisted as a confidential informant when Martinez and Machado approached him in late September 2013.  The record does not reflect whether the State was seeking information or testimony from Torres on unrelated matters at the time the undisclosed email was sent.  Second, even assuming the undisclosed email relates to Torres's knowledge of Griego's criminal conduct, the value of the email as additional impeachment material is negligible.  At trial, Torres acknowledged he was still subject to State sanction and therefore at the State's "mercy."  Given this admission, there is no "reasonable probability" that the undisclosed information would have affected the verdicts.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (explaining a defendant establishes prejudice by demonstrating that the undisclosed evidence is material, which requires a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").  That is, Torres's status as a confidential informant, combined with his trial testimony, made it clear he was trying to curry favor with the State, and there is no basis to believe additional evidence to that effect would have altered the trial outcome.  Therefore, the trial court did not abuse its discretion by denying Griego's motion to vacate the judgment.[6]

## II.        Alleged Prosecutorial Misconduct

¶21        Griego contends the prosecutor engaged in misconduct by misstating the evidence during closing argument.  He did not object on this basis in the trial court, and we therefore review only for fundamental, prejudicial error.  *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19-20 (2005).  Under this standard of review, a defendant must first prove that misconduct actually occurred.  *State v. Edmisten*, 220 Ariz. 517, 524, ¶ 23 (App. 2009) (citing *Henderson*, 210 Ariz. at 568, ¶ 23).  The defendant must also demonstrate "that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and

_____

[6]        To the extent Griego contends the trial court erred by failing to hold an evidentiary hearing on the motion to vacate, the record does not reflect that he ever requested such a hearing.  *See Strickler*, 527 U.S. at 291 (explaining a defendant bears the burden of proving a *Brady* violation) (citing *Kyles v. Whitley*, 514 U.S. 419, 534 (1995)).

persistent that it permeates the entire atmosphere of the trial.'" *Id.* (quoting *State v. Atwood*, 171 Ariz. 576, 611 (1992), and citing *State v. Lee*, 608, 616 (1997)). Prosecutorial misconduct is not "merely the result of legal error, negligence, mistake or insignificant impropriety." *State v. Martinez*, 221 Ariz. 383, 393, ¶ 36 (App. 2009) (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108 (1984)). Rather, viewed in its entirety, it is intentional conduct the prosecutor knows to be improper and prejudicial and which he pursues for any improper purpose. *Id.*

**¶22** Because none of the surviving victims identified Griego as a participant in the home invasion, his trial defense focused primarily on challenging his codefendants' credibility, arguing the men conspired to exculpate themselves by making him "the fall guy." During the State's case-in-chief, defense counsel elicited admissions regarding each codefendant's prior criminal activity and questioned the extent to which they correlated their trial testimony. Ochoa denied speaking with Martinez, Machado, and Griego after the home invasion. Martinez and Machado acknowledged staying together at a friend's apartment for two weeks after the shooting until their joint arrest but denied talking about the home invasion other than discussing: (1) what they could have done to prevent the murder, and (2) whether they should testify. Torres also denied discussing the substance of his testimony with the other men. Torres admitted, however, that Machado and Martinez probably suspected he was working for the police and acknowledged it was possible they "play[ed]" him when they participated in the recorded conversation and identified Griego as the shooter.

**¶23** During closing argument, the prosecutor addressed Griego's theory of witness collusion. She argued the codefendants' testimony was reliable because it was consistent despite the lack of "an opportunity to sit together and get their stories straight." She reminded the jurors that Ochoa left Martinez and Machado at their friend's apartment the night of the home invasion and never spoke to them again. She also referenced Martinez's and Machado's trial testimony and stated, "[they] told you that they did not discuss the case in between the home invasion and their arrest . . . they did not have the opportunity to manufacture a story. So, each time there was a similarity in their stories, that should tell you that they are telling the truth." After recounting their testimony, the prosecutor characterized Ochoa, Martinez, and Machado as "three independent witnesses who have not had an opportunity to get their stories straight with each other."

**¶24** Griego argues the prosecutor's claim that the witnesses did not have an opportunity to collude was contrary to the evidence and

therefore misconduct. Specifically, he contends the "State knew" that Torres, Martinez, and Machado had "an opportunity to collude" the evening Torres wore a wire and recorded their discussion of the home invasion.

¶25 "Prosecutors have 'wide latitude' in presenting their arguments to the jury" and may argue all reasonable inferences from the evidence. *State v. Morris*, 215 Ariz. 324, 336, ¶ 51 (2007) (quoting *State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000), and *Hughes*, 193 Ariz. at 85, ¶ 59). A prosecutor may not, however, "make insinuations that are not supported by the evidence." *Id.* (quoting *Hughes,* 193 Ariz. at 85, ¶ 59).

¶26 While the evidence could support the conclusion that some witnesses had an opportunity to collude, the record includes sufficient evidence to support the prosecutor's argument. When questioned, Ochoa, Machado, Martinez, and Torres unambiguously denied discussing their trial testimony with each other.

¶27 Moreover, contrary to Griego's claims, nothing in the record suggests the State attempted to conceal or minimize Torres's recorded meeting with Martinez and Machado after the home invasion. To the contrary, the prosecutor called Torres to testify, questioned him at length regarding the meeting, played portions of the recording for the jury, and introduced a complete transcript of the recording as an exhibit. Indeed, the prosecutor directly referenced the meeting during her closing argument and characterized it as a dinner conversation among friends with "no one else around." Viewing the challenged statements in context, it is clear the prosecutor relied upon the codefendants' denials to refute Griego's collusion claims. She did not argue, as Griego contends, that it was logistically impossible for the men to coordinate their testimony.

¶28 Furthermore, the trial court instructed the jury that the lawyers' arguments were not evidence to be considered in reaching their conclusions, and we presume jurors follow the court's instructions. *Id.* at 336-37, ¶ 55 (citing *State v. Newell*, 212 Ariz. 389, 403, ¶¶ 67-68 (2006)). Therefore, even if the prosecutor's comments were improper, the court's final instructions "negated their effect," and there was no resulting prejudice. *Id.* at 337, ¶ 55.

## III. Presentence Incarceration Credit

¶29 Griego contends he did not receive appropriate presentence incarceration credit, and, in that regard, the State concedes error.

¶30	"All time actually spent in custody pursuant to an offense until the prisoner is sentenced to imprisonment for such offense shall be credited against the term of imprisonment."  A.R.S. § 13-712(B).  When a trial court imposes concurrent terms of imprisonment, the defendant is entitled to presentence incarceration credit on each count, *see State v. Cruz-Mata*, 138 Ariz. 370, 375 (1983), and the failure to give full credit constitutes fundamental error, *State v. Cofield*, 210 Ariz. 84, 86, ¶ 10 (App. 2005) (quoting *State v. Ritch*, 160 Ariz. 495, 498 (App. 1989)).

¶31	At sentencing, Griego received 867 days' credit only as to Count 1.  Because each of the sentences runs concurrently, he should have received 867 days' credit as to each count.  We modify his sentence accordingly.  *See* Ariz. R. Crim. P. 31.17(b); *State v. Stevens*, 173 Ariz. 494, 496 (App. 1992) (modifying the defendant's sentence to reflect correct presentence incarceration credit).

## CONCLUSION

¶32	Griego's convictions are affirmed.  His sentences are affirmed as modified.  *See supra* n.4 & ¶ 31.