NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

DIMITRI ROZENMAN, *Appellant*.

Nos. 1 CA-CR 13-0458, 1 CA-CR 13-0898 (Consolidated)
FILED 1-29-2015

Appeal from the Superior Court in Maricopa County
No. CR2009-007039-001
The Honorable Bruce R. Cohen, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Michael J. Dew, Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

Dimitri Rozenman, Buckeye
*Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Jon W. Thompson delivered the decision of the Court, in which Judge Donn Kessler and Judge Kent E. Cattani joined.

---

**T H O M P S O N**:

¶1 Defendant Dimitri Rozenman appeals his convictions and sentences for conspiracy to commit first-degree murder and for criminal damage, a domestic violence offense. This case comes to us as an appeal under *Anders v. California*, 386 U.S. 738 (1967) and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). Defendant's appellate counsel has searched the record on appeal and found no arguable nonfrivolous question of law, and asks us to review the record for fundamental error. Defendant has filed a supplemental brief *in propria persona* in which he raises several issues for appeal.

¶2 We have searched the record for fundamental error and considered the issues identified by Defendant, and have found no reversible error. All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure and substantial evidence supported the convictions. Defendant was present and represented himself at trial and at sentencing, and was given the opportunity to speak at sentencing, at which time the court imposed a legal sentence except insofar as noted below.

¶3 We have noted an error in the sentencing minute entry. The sentencing minute entry ordered Defendant to "submit to DNA testing for law enforcement identification purposes and pay the applicable fee for the cost of that testing in accordance with [Arizona Revised Statutes ("A.R.S.") section] 13–610 [(Supp. 2013)]." However, A.R.S. § 13–610 does not authorize the superior court to order a convicted person to pay for the cost of DNA testing. *State v. Reyes*, 232 Ariz. 468, 472, ¶ 14, 307 P.3d 35, 39 (App. 2013). Therefore, we vacate that portion of the sentencing minute entry which requires Defendant to do so.

¶4 Accordingly, we affirm Defendant's convictions and sentences as modified.

I.      **Procedural Background**

**¶5**          A grand jury indicted Defendant in June 2009 on one count of conspiracy to commit first-degree murder, and one count of criminal damage of between $2,000 and $10,000, a domestic violence offense, charges stemming from damage to the vehicles of his ex-wife and her family and a plot to murder them.  Following a trial in 2010, a jury convicted Defendant of the charged offenses.  The trial court granted a new trial on the ground that the state had failed, albeit inadvertently, to properly disclose to Defendant one of the surveillance recordings of a February 13, 2009 meeting to discuss the murder conspiracy, the so-called Hawk recording.

**¶6**          Defendant represented himself at the second trial, and a jury again convicted him of the charged offenses.  The trial court sentenced Defendant to life with possibility of parole after 25 years for the conviction on conspiracy to commit first-degree murder, and a concurrent sentence of 2 years on the criminal damage conviction.[1] The trial court gave Defendant 1,565 days of presentence incarceration credit.

**¶7**          The trial court later denied Defendant's motion for new trial, which raised numerous issues relating to the four-month delay by police in impounding the recordings of surveillance and a confrontation call, and the admission of those and other recordings at trial.  The trial court found it had no jurisdiction to decide Defendant's late-filed motion to vacate judgment, in which Defendant argued that the testimony before and at trial of the investigating officers showed that they conspired to obstruct justice by deliberately concealing the existence of the Hawk recording.  The court concluded, however, that if it had jurisdiction over the motion to vacate judgment, it would deny it.  Defendant filed timely notices of appeal of the convictions and the order denying his post-verdict motions and we have

---

[1]      The presumptive sentence for this class 5 felony is 1.5 years.  *See* A.R.S. § 13-1602(B)(3) (Supp. 2014); A.R.S. § 13-702(D) (2010).  The jury did not find any aggravating circumstances, and the superior court did not mention any in sentencing Defendant to an aggravated sentence on this conviction. Defendant, however, did not object.  It is possible the court meant to aggravate the sentence by a circumstance implicit in the verdicts. Moreover, the superior court gave Defendant 1,565 days, or nearly four years, of presentence incarceration credit on this sentence, and thus, any error under *Blakely v. Washington*, 542 U.S. 296 (2004), did not prejudice Defendant, as necessary for reversal on fundamental error review.

jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) (Supp. 2014), 13-4031 (2010), and 13-4033(A) (2010).[2]

## II.     Discussion

### A.     Sufficiency of Evidence

**¶8**          Defendant argues on appeal that his conviction was contrary to the weight of the evidence because the evidence demonstrated he did not consciously agree to any plot to murder his ex-wife and her family.  We review *de novo* the sufficiency of the evidence to support a conviction.  State v. *West,* 226 Ariz. 559, 562, ¶ 15, 250 P.3d 1188, 1191 (2011).  We review for abuse of discretion the superior court's denial of a motion for new trial based on the weight of the evidence.  *State v. Neal*, 143 Ariz. 93, 97, 692 P.2d 272, 276 (1984); *see* Ariz. R. Crim. P. 24.1(c)(1).  The superior court abuses its discretion in denying a motion for new trial if the evidence is not sufficient to support the verdict.  *Neal*, 143 Ariz. at 97, 692 P.2d at 276.  In reviewing the evidence, we view the facts in the light most favorable to upholding the jury's verdict, resolving all conflicts in the evidence against the defendant. *State v. Girdler,* 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983); *State v. Henry*, 176 Ariz. 569, 577, 863 P.2d 861, 869 (1993).  Credibility of the witnesses is an issue for the jury, not this court.  *State v. Dickens,* 187 Ariz. 1, 21, 926 P.2d 468, 488 (1996). [3]

**¶9**          The evidence at trial was more than sufficient to support the convictions.  The offense of conspiracy to commit first-degree murder required proof in pertinent part that 1) "with the intent to promote or aid the commission of an offense"; 2) the defendant "agree[d] with one or more persons that at least one of them or another person [would] engage in conduct constituting the offense"; and 3) the intended conduct would constitute first-degree murder.  A.R.S. § 13-1003(A) (2010); *see* A.R.S. § 13-1105(A)(1) (2010).  Criminal damage requires proof that a defendant recklessly damaged property of another person.  A.R.S. § 13-1602(A) (Supp. 2014).

**¶10**          The evidence demonstrated that in 2008 Defendant hired L.N. at his cigar business.  L.N. testified that Defendant regularly complained

---

[2]     We cite the current versions of the applicable statutes when no revisions material to this decision have since occurred.

[3]     *Abrogated on other grounds by State v. Ferrero,* 229 Ariz. 239, 242-43, ¶¶ 15-20, 274 P.3d 509, 512-13 (2012).

about his wife and was angry she refused to sign a postnuptial agreement to accept $50,000 in the event of a divorce. L.N. also stated that Defendant told him that if he and his wife "were still back in Russia, that she would be dead or they would kill her."

¶11     Defendant served his wife with divorce papers in March 2008, and directed L.N. to move her belongings to her parents' house. One night in October 2008, L.N. saw Defendant puncture the tires of three vehicles belonging to his wife's family, and pour sugar into the gas tank of one of them. The repairs cost in excess of $2,000.

¶12     When the divorce decree ordering Defendant to pay his wife approximately $500,000 was issued in late January 2009, Defendant was "incoherent and really upset," and told L.N. he wished his ex-wife were dead. Sometime after that, L.N. testified, Defendant approached him and proposed a plan whereby L.N. would hire people to force his ex-wife to sign a paper agreeing to relinquish all money awarded in the divorce decree, and then kill her and her family. Defendant offered to pay L.N. $70,000 in installments, and later gave L.N. $5,000 in cash.

¶13     L.N. ultimately told Defendant's ex-wife of the plot, and agreed to allow police to hide video and audio recorders on him for a meeting L.N. arranged with Defendant for the night of February 13, 2009. During the meeting, L.N. told Defendant that his ex-wife had signed the documents, and she and her family had been bound up "execution style" and had been beaten. L.N. told Defendant he was not going to give Defendant "details of how they're gonna murder them," and talked about "hit guys," and when they would "go and shoot them people." Defendant gave L.N. $500 in cash to get the hit men out of town. Defendant indicated by nodding that all he wanted L.N.'s men to do was kill the ex-wife and her family, and he would handle disposing of the hit men. During that meeting, Defendant never told L.N., "you're scaring me," threatened to call police, or called him crazy.

¶14     In a recorded confrontation call six days later, L.N. told Defendant that his ex-wife and her parents were dead, to which Defendant immediately asked L.N. when he was going to return to work. Defendant did not call 9-1-1 that night to report that he had just been told his ex-wife and her family had been murdered.

¶15     When police called on Defendant at his girlfriend's apartment early the next morning and told him about the "murders," and repeatedly asked him if he knew who might have done this, Defendant never

mentioned L.N. Police arrested Defendant and served him later that day with a protection order from his ex-wife, and told him that his ex-wife and her family were safe. At that time, Defendant told police that he was concerned that hit men hired to commit the murders might come looking for him.

**¶16** This evidence was more than sufficient to prove beyond a reasonable doubt that Defendant caused more than $2,000 in damages to the vehicles of his ex-wife and her family, and later conspired with L.N. to murder them.

### B. Other Issues Raised in Supplemental Brief

**¶17** Defendant raises numerous additional issues in his supplemental brief, most relating to admission at trial of the recordings of surveillance (exhibits 96 and 97), the later confrontation call (exhibit 90), and questioning by police at his girlfriend's apartment (exhibit 100), and testimony relating to their impoundment and disclosure.

### 1. Delay in Impounding Recordings

**¶18** Defendant raises a number of legal grounds for reversal related to the alleged failure of the investigating officers to properly impound three of the recordings for four months after they were created, and the fourth for one month after it was created.

**¶19** The background on these issues is as follows. The lead detective testified at trial that he did not impound the recordings of the February 13, 2009 surveillance or the later confrontation call for four months because he continued his investigation until a grand jury met to consider the charges -- more than four months after the date of the surveillance. He stated that during the four months prior to impound, when the recordings were not being used, he kept them secured in a locked drawer in his desk. The detective also asserted that this method of handling such evidence was not uncommon, and distinguished it from the practice of immediately impounding evidence such as drugs, guns, or money. Another detective who had recorded Defendant's responses to police while being told that his ex-wife had been murdered testified that he did not impound the recording for about a month because it made no sense to travel the forty mile round-trip to the impound warehouse each time he needed to listen to the recording while he continued to work with other detectives on this complex investigation.

**¶20** After trial, an associate of Defendant searched the internet and discovered Operations Order 8.1 within a 1,200 page manual on Phoenix Police rules, guidelines and procedures. Defendant's discovery of Operations Order 8.1 formed the basis, in large part, for Defendant's motion for new trial, in which he argued that pursuant to Operations Order 8.1, "[a]ll property will be impounded prior to the end of the shift" except when authorized by a supervisor. Defendant contended that he was thus denied a fair trial, having unsuccessfully sought police impound policies in pretrial discovery and having elicited testimony at trial from the investigating officers that they retained the recordings for investigative purposes as common practice. Insofar as the record reflects, however, Defendant did not supply any expert or other witness who testified that such policy was violated by the conduct of the detectives in this case. Although both Defendant's and the State's expert testified that they found no evidence that anyone had altered or tampered with the recordings, Defendant nevertheless argued in his posttrial motion that the only reasonable explanation for the four-month delay in impounding the recordings was to allow the lead detective sufficient time to tamper with them.

**¶21** Following two days of oral argument, the judge denied the motion for new trial, reasoning that he had given Defendant great latitude during trial in presenting his defense, and that through cross-examination and argument, Defendant had raised these same issues with the jury, the fact-finder and the sole judge of credibility, and it had found him guilty.

### a. *Youngblood* **Claim**

**¶22** Defendant argues that his due process rights were violated pursuant to *State v. Youngblood*, 173 Ariz. 502, 844 P.2d 1152 (1993), because the investigating officers acted in bad faith in failing to impound the recordings at the end of the shift, per the plain wording of Phoenix Police Operations Order 8.1. Defendant argues that had the recordings been properly impounded, the audio and video might have been more accurate and might have exonerated him.

**¶23** In *Youngblood*, our supreme court held that "absent bad faith on the part of the state, the failure to preserve evidentiary material which could have been subjected to tests, the results of which might have exonerated the defendant, does not constitute a denial of due process of law under the Arizona Constitution." *Id.* at 508, 844 P.2d at 1158; see Ariz. Const., art. 2, § 4; *see also Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) (holding the same under the Due Process Clause of the Fourteenth Amendment to the United States Constitution). To any extent that the

ostensible police failure to follow Operations Order 8.1 can be construed as a failure to "preserve" the recordings for purposes of *Youngblood*, Defendant has failed to persuade us that the investigating officers did so in bad faith. We accordingly find no merit in this argument.

b.      ***Brady* Claim**

**¶24**      Defendant also argues that the State violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and thereby deprived him of a fair trial by failing to comply with his pretrial request for the police department's policies and procedures for impounding evidence; by offering allegedly false testimony from officers on this issue; and by arguing in closing that "it is common police procedure not to impound evidence while conducting an investigation." In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87.

**¶25**      Evidence is considered "material" for purposes of *Brady* only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) (holding that evidence of prior convictions of victim for possession of knives was not material notwithstanding defendant's claim of self-defense, in part because it was cumulative of other evidence that he had knives on him at the time of his murder).

**¶26**      The record fails to reveal any testimony to support Defendant's claim that Operations Order 8.1 applies to the recordings at issue, that the investigating officers lied in testifying that it was common practice to retain surveillance recordings (rather than send them to the impound warehouse) while investigating the offense, or that anyone tampered with the recordings during the four months they were not impounded. Under these circumstances, we are not persuaded that Operations Order 8.1 was evidence material to his guilt, as required to establish a *Brady* violation.

c.      **Denial of Motion for New Trial**

¶27        Defendant also argues that the trial court erred in denying his motion for new trial based on the newly discovered evidence of Operations Order 8.1.  We review a trial court's ruling on a motion for new trial based on newly discovered evidence for abuse of discretion.  *State v. Orantez*, 183 Ariz. 218, 221, 902 P.2d 824, 827 (1995).  To warrant a new trial, a defendant "must show that (1) the newly-discovered evidence is material; (2) the evidence was discovered after trial; (3) due diligence was exercised in discovering the material facts; (4) the evidence is not merely cumulative or impeaching, unless the impeachment evidence substantially undermines testimony that was of critical significance at trial; and (5) that the new evidence, if introduced, would probably change the verdict or sentence in a new trial."  *Id.* at 221, 902 P.2d at 827.  Again, in the absence of any testimony that Operations Order 8.1, in fact, applies to such recordings, or that anyone tampered with the recordings before they were impounded, we are not persuaded that this evidence was material, or that it "would probably change the verdict or sentence."  Consequently, we conclude that the trial court did not abuse its discretion in denying Defendant's motion for new trial.

## 2.        Denial of Motion to Exclude Recordings

¶28        Defendant next argues that the trial court abused its discretion in failing to exclude the recordings at trial based on the four-month delay in their impoundment, the delay in disclosing the existence of the Hawk recording, alleged perjury and witness tampering related to testimony on the Hawk recording, and anomalies in the recordings themselves.  He contends that because both experts testified that the recordings *could* be subject to tampering, the "anomalies on the recordings,"[4] as well as unidentified evidence indicating that they were not

---

[4]        Defendant's expert alluded to unidentified "anomalies" in the recordings but testified that he could not say that there were alterations in the recordings.  The evidence does not support Defendant's claim on appeal that the header in the Hawk recording showed a date of 12/30/1899.  Although during his cross-examination of the state's sound expert, Defendant announced that he was showing the jury a document with a 12/30/1899 date in the Hawk header, Defendant agreed with the sound expert that the document did not come from the expert's report.  Moreover, Defendant failed to identify the source of the document from any exhibit number, nor did he seek an explanation from the sound expert as to what that date might mean in the context that it appeared.  Our review of the header on the Hawk recording does not show such erroneous date.

the original recordings, suggest tampering and rob the recordings of trustworthiness.

**¶29**     Defendant filed several motions in limine to exclude the surveillance recordings at trial on the grounds that they lacked trustworthiness.  The trial court denied Defendant's motions, reasoning that the issues that he raised went to the weight of the evidence and not its admissibility.  The trial court, however, stated it would give Defendant significant leeway in asking the witnesses questions that he believed would shed light on the unreliability of the recordings.

**¶30**     "Whether a party has laid sufficient foundation for admission of evidence is within the sound discretion of the trial court." *State v. George*, 206 Ariz. 436, 446, ¶ 28, 79 P.3d 1050, 1060 (App. 2003).  We find no abuse of discretion here.  The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Ariz. R. Evid. 901(a).  Circumstantial evidence may be used to prove the authenticity of a sound recording. *State v. Lavers,* 168 Ariz. 376, 388 n.8, 814 P.2d 333, 345 n.8 (1991).  The question for the trial judge is not whether the evidence is authentic, but only whether evidence exists from which the jury could reasonably conclude that it is authentic.  *Id.* at 386, 814 P.2d at 343.

**¶31**     In this case, a detective testified that he created the original disks, the Hawk and audio/video recordings, shortly after the surveillance was concluded**.**  Additionally, L.N. testified that he had reviewed both recordings, as well as the recording of the confrontation call, and believed they were fair and accurate depictions of what had occurred.  Another detective likewise testified that he personally recorded the visit with Defendant to notify him of his ex-wife's death, and retained custody of the original recording for about a month before formally impounding it.  The recording was admitted as an exhibit without objection.

**¶32**     We find no merit in Defendant's claim that the lead detective lied under oath and told other witnesses to lie under oath, in testifying how many recordings were obtained from the surveillance.  Moreover, in light of the absence of testimony and evidence demonstrating that the recordings where tampered with or should have been impounded sooner, we are not persuaded that the delay in impoundment made the recordings unreliable. Therefore, we conclude that Defendant has failed to raise any genuine issue as to the trustworthiness of the recordings, and the trial court did not abuse its discretion, much less fundamentally err, in admitting the recordings at trial.

### 3.    Limitations on Presentation of Defense Case

¶33    Defendant raises a number of issues related to the limitations he believed were imposed by the trial court prior to trial on his presentation of his case, in violation of his constitutional right to due process. Defendant first argues that the trial court erred in limiting his cross-examination of the investigating officers to questions that would reflect on their credibility and motive, thereby preventing him from referring to the lead detective's alleged obstruction of justice and intentional suppression of the Hawk recording in his opening statement. He also asserts that the trial court erred by allowing the lead detective to testify that the court had previously held that the Hawk recording had been disclosed, in response to Defendant's cross-examination question on whether the detective had suppressed the Hawk recording. Finally, he contends that the trial court erred in precluding him from calling his former defense attorney as a witness to testify that he was misled by the investigating officers before the first trial as to existence of the Hawk recording.

¶34    The constitutional rights to due process, compulsory process, and confrontation guarantee a criminal defendant "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690 (1986). A defendant's right to present evidence is subject to restriction, however, by application of reasonable evidentiary rule*s. United States v. Scheffer,* 523 U.S. 303, 308 (1998). Although we ordinarily review evidentiary rulings for abuse of discretion, we review evidentiary rulings that implicate a defendant's constitutional rights *de novo. State v. Ellison,* 213 Ariz. 116, 120, ¶ 42, 140 P.3d 899, 903 (2006).

¶35    We have reviewed the entire record, and conclude that the trial court did not err, much less fundamentally err, in imposing the limits it did on Defendant's presentation of his case. The trial court allowed Defendant considerable leeway in questioning the investigating officers, including the lead detective, on whether they had intentionally misled Defendant as to the existence of the Hawk recording, or had suppressed it. We find no error in the trial court's admonishment to Defendant that he could not make arguments in his opening statement. *See State v. King*, 180 Ariz. 268, 278, 883 P.2d 1024, 1034 (1994). Nor do we find no error in the trial court's determination that Defendant had opened the door to the detective's recitation of a court's prior finding that the Hawk recording had been disclosed, by asking the detective if he had suppressed the recording. *See State v. Lawrence*, 123 Ariz. 301, 304-05, 599 P.2d 754, 757-58 (1979). Additionally, we find no error in the trial court's preclusion testimony from Defendant's former counsel to establish that the attorney believed the lead

detective had misled him as to the existence of the Hawk recording, on the grounds the potential to confuse the jury would far outweigh any probative value of this testimony. The court did not preclude Defendant from arguing in closing any reasonable inferences from the evidence, and specifically did not preclude him from arguing that the investigating detectives obstructed justice or that they suppressed the evidence.

¶36 Defendant also argues that the trial court erred in precluding him from offering the jury a transcript of the surveillance audio prepared by his sound expert as an aid during the expert's testimony, to show that after the surveillance, the detectives accidentally recorded themselves engaged in drug use. We have reviewed the record on this issue, and conclude that the trial court appropriately precluded use of this transcript on the grounds that the sound expert was not a party to the conversation, had no greater expertise in listening than anyone else, and to the extent the expert had used specialized equipment to increase audibility, had not prepared an enhanced recording for the jury to hear. *See* Ariz. R. Evid. 702. Nor are we persuaded (especially in light of our inability to hear any of the claimed evidence of drug use in our review of the exhibit) that the trial court erred in precluding Defendant from examining the lead detective on whether the recording revealed evidence of the detectives' drug use. *See* Ariz. R. Evid. 403.

### 4. Issues Related to State's Sound Expert

¶37 Defendant argues that the State violated his rights under *Brady* and the discovery rules by failing to disclose the report of its sound expert until after jury selection had begun, and not ordering the State to produce its expert for an interview before trial. *Brady*, 373 U.S. at 87. We review a trial court's rulings on discovery issues for abuse of discretion. *State v. Connor*, 215 Ariz. 553, 557, ¶ 6, 161 P.3d 596, 600 (App. 2007). "To the extent [d]efendant sets forth a constitutional claim in which he asserts that the information is necessary to his defense, however, we will conduct a de novo review." *Id.*

¶38 We find no merit in Defendant's argument that the delayed disclosure of the expert report violated his *Brady* rights and the discovery rules. To demonstrate a *Brady* violation, a defendant must show that the prosecution suppressed material evidence favorable to the accused. *Brady*, 373 U.S. at 87. The record shows that the State's sound expert was hired to provide enhanced recordings, and that his report summarizing the characteristics of the original disks and the measures he took to create the enhanced recordings was disclosed shortly if not immediately after it was

completed, which was four days before Defendant gave his opening statement and two weeks before the sound expert testified. Defendant has failed to show that the report itself contained any material evidence favorable to him, that is, evidence that impeached the credibility of the lead detective by casting doubt on the trustworthiness of the recordings. The favorable evidence cited by Defendant on appeal – a supposed 1899 date in the header of the Hawk recording, which Defendant argues was suggestive of tampering – was not in fact found in the sound expert's report, as Defendant himself conceded at trial. Under these circumstances, we conclude that the report contained no material evidence favorable to Defendant, necessary to establish a *Brady* violation. Moreover, in light of the record showing that the report was disclosed as soon as it was completed and two weeks before the sound expert testified, we are not persuaded either that the State violated Arizona Rule of Criminal Procedure 15.1, or that Defendant suffered any prejudice from the failure to disclose it earlier. *See State v. Martinez-Villareal*, 145 Ariz. 441, 448, 702 P.2d 670, 677 (1985); Ariz. R. Crim. P. 15.1 (b)(4), (e)(3).

¶**39**    Further, the trial court did not violate Defendant's due process right by refusing to order the State to produce its sound expert for an interview before Defendant made his opening statement. Defendant first expressed an urgent need to interview the State's sound expert the day before jury selection was set to begin on February 25, 2013. Defendant did not, however, ask for a continuance to allow him to interview the sound expert before he made his opening statement. The trial court ordered the State to produce the expert for an interview as soon after February 25, 2013, as an interview could be arranged. The record reveals an avowal by the State that it produced its sound expert for an interview two days during the following week, the week of March 4, 2013, but Defendant "opted not to interview him until the week of March 11, 2013." The record also shows that Defendant's advisory counsel finally interviewed the State's sound expert on March 12, 2013, two days before the sound expert testified. The State's sound expert testified that it was possible to tamper with recordings, although such tampering would be easily detected, and he could find no evidence of tampering.

¶**40**    Under these circumstances, we are not persuaded by Defendant's argument that his inability to interview the sound expert before he made his opening statement somehow prejudiced him or constituted an unreasonable limitation on his presentation of his defense. Consequently, the court did not err, much less fundamentally err, in not requiring the report or the expert to be produced sooner.

### 5. Prosecutorial Misconduct

**¶41** Defendant argues that the trial court erred in overruling his objection to the prosecutor's argument that the surveillance tape showed that Defendant nodded when L.N. asked Defendant if Defendant wanted him to "just stick to the initial contract, take care of Jana and them, and I'll leave the hit men for you to take care of later?" We find no merit in this argument: the prosecutor's argument represented a reasonable interpretation of the evidence.

**¶42** Lastly, Defendant contends that the prosecutor must have known that the lead detective was offering perjured testimony when the detective testified that the county attorney was allowed to have evidence during the course of an investigation. Defendant offers no support for his claim that this testimony was perjured, and we could find none in the record. We accordingly find no fundamental error on this basis.

## III. Conclusion

**¶43** For the foregoing reasons, we affirm Defendant's convictions and sentences as modified by vacating the order that Defendant pay the fee for DNA testing.

**¶44** Counsel's obligations pertaining to Defendant's representation in this appeal have ended. Counsel need do nothing more than inform Defendant of the status of the appeal and his future options, unless counsel's review reveals an issue appropriate for submission to the Arizona Supreme Court by petition for review. *State v. Shattuck*, 140 Ariz. 582, 584–85, 684 P.2d 154, 156–57 (1984). Defendant shall have thirty days from the date of this decision to proceed, if he so desires, with an *in propria persona* motion for reconsideration or petition for review.



Ruth A. Willingham · Clerk of the Court
FILED : ama